**RAYLE TECH, INC., d/b/a Callaway Farms, Inc., Plaintiff,**

v.

**DEKALB SWINE BREEDERS, INC., Defendant.**

Civ. A. No. CV194–072.

United States District Court,
S.D. Georgia,
Augusta Division.

July 6, 1995.

Thomas William Tucker, Dye, Tucker, Everitt, Wheale & Long, Augusta, GA, Charles T. Patterson, Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schat, Sioux City, IA, for DeKalb Swine Breeders, Inc.

## ORDER

BOWEN, District Judge.

Before the Court in the above-captioned case is Defendant DEKALB Swine Breeders, Inc.'s Motion for Summary Judgment (Mar. 17, 1995). For the reasons discussed below, DEKALB's Motion is **GRANTED.**

## I. Factual Background[1]

At all times relevant to this dispute, Plaintiff, Rayle Tech, Inc., d/b/a Callaway Farms, Inc. ("Callaway"), maintained a rather large swine breeding herd in Wilkes County, Georgia. Callaway's herd contained approximately 5000 sows. Defendant DEKALB Swine Breeders, Inc. ("DEKALB") is in the business of raising and selling swine breeding stock.

Callaway, which regularly introduces new breeding stock into its herd, began purchasing boars and sows from DEKALB in 1989. From 1989 through 1994, the parties executed numerous written contracts documenting Callaway's purchase of breeding stock from DEKALB. Each contract states that "[t]his contract shall be governed by the laws of the State of Illinois." (Stip., Exhibit A, ¶ 7.)

The contracts in question, attached to the parties' Stipulation of Facts as Exhibits A, B, C, D, E and F, contain limited fertility warranties but disclaim liability in connection with disease. The contracts state in blocked, bold letters: "DEKALB cannot and does not guarantee the absence of any pathogens or disease in the breeding stock sold by DEKALB. Pathogens or diseases may be present at the time of sale or may appear later." (Stip., Exhibit A, ¶ 10.) The contracts further provide that replacement of the swine is the buyer's sole and exclusive remedy.

David E. Hudson, Hull, Towill, Norman & Barrett, Augusta, GA, for Rayle Tech, Inc.

1. The parties filed an admirable joint Stipulation of Facts which provides the factual basis for purposes of considering Defendant's Motion for Summary Judgment. By such reference the Stipulation is incorporated herein. The professionalism which resulted in the Stipulation saved the client-parties tens of thousands of dollars in fees and costs.

Each contract contains the following merger provision: "[t]his Contract supersedes all prior written or oral agreements related to the swine sold hereunder, and this contract cannot be amended except in a writing which refers to this Contract and which is signed by both parties." The contracts also provide a blank for the purchaser to state any promises or representations made by the seller not otherwise specified in the contract; in five of the six contracts, Eugene Callaway, Jr., an officer of Callaway, wrote "none" in the blank.

Porcine Reproductive and Respiratory Syndrome (PRRS) is a serious viral pig disease. In sows, PRRS may cause abortions, stillborns, and birth of underweight and defective pigs. PRRS is highly contagious. It can be contracted from infected animals introduced into the herd and from semen of boars used for breeding. At the time they executed the contracts of sale at issue here, the parties had not discussed PRRS.

In the last half of 1992 and the first part of 1993, DEKALB knew that its herds had either been infected with or exposed to PRRS.[2]

Callaway's herds tested negative for PRRS in March 1993. To protect its herds, Callaway decided not to purchase breeding animals which had been exposed to PRRS. In late 1992 and early 1993, Callaway considered changing from DEKALB to a different supplier of genetic breeding stock but declined to do so when it learned that the other supplier, Pig Improvement Company, had tested positive for PRRS in its farms. In the latter part of 1992, Callaway explained to DEKALB's sales personnel that Callaway wanted to avoid PRRS and that it was reluctant to change suppliers because DEKALB's herds were PRRS free and Pig Improvement's were not. A DEKALB salesman (Clinton Day) replied: "Well, that is a pretty good reason to stay with us." (Stip., ¶ 2(h).)[3]

On March 11, 1993, Callaway received nineteen boars and gilts from DEKALB. The animals had no clinical signs of PRRS at the time they were shipped or when they were delivered on March 11, 1993. (Stip., ¶ 2(o).) On April 9, 1993, Callaway's herds broke with the PRRS virus. Callaway alleges that DEKALB's shipment of diseased animals was, under the circumstances, fraudulent. After the delivery of the swine which Callaway alleges infected its herds with PRRS, Callaway continued to accept new deliveries of swine from DEKALB. (Stip., ¶ 2(z).)

Callaway seeks consequential damages in excess of $2,000,000.

## II. Analysis

### A. Summary Judgment Standard

■ The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The applicable substantive law identifies which facts are material in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ "The movant bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). When the *moving* party has the burden of proof at trial, that party must carry its burden at summary judgment by presenting evidence affirmatively showing that, "on all the essential elements of its case ..., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). When the *non-moving* party has the burden of proof at

---

**2.** During 1992 and 1993, Dekalb received 829 positive blood tests for the PRRS virus. (Stip., ¶ 2(k).) In November of 1992, Dekalb observed clinical signs of the disease in one of its herds. *Id.* Clinical evidence of PRRS eventually appeared in eight of Dekalb's foundational farms. *Id.* Prior to March 11, 1993, two of Dekalb's customers complained that their herds were in-

fected with PRRS by animals purchased from Dekalb. *Id.*

**3.** Dekalb admits, for purposes of its Motion for Summary Judgment, that Day made that statement and that, at the time he made that statement, Dekalb's herds were not PRRS free.

trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-moving party cannot meet its burden of proof at trial, *see Clark*, 929 F.2d at 606–08 (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); merely *stating* that the non-moving party cannot meet its burden at trial is *not* sufficient, *Clark*, 929 F.2d at 608. Any evidence presented by the movant must be viewed in the light most favorable to the non-moving party. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

■ If—and *only* if—the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). Rather, the non-moving party must respond by affidavits or as otherwise provided in Fed.R.Civ.P. 56. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. A genuine issue of material fact will be said to exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510.

The clerk has given the non-moving party notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and of the consequences of default; thus, the notice requirements of *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration. The Court will proceed to review the applicable substantive law and inquire whether the moving party—and, if necessary, the non-moving party—has carried its burden as set forth above. *See Clark*, 929 F.2d at 609 n. 9.

**B. Summary Judgment in this Case**

Callaway seeks to recover under two separate Illinois statutes and under the Georgia common law of fraud.

**1. Illinois Statutory Claims**

Each of the contracts provides that "[t]his Contract shall be governed by the laws of the State of Illinois." (Stip., Exhibit A, ¶ 7.) Relying upon this clause, Callaway alleges causes of action for violations of two Illinois statutes: the Illinois Diseased Animal Act, Ill.Ann.Stat. ch. 510, § 50/24 (Smith–Hurd 1995), and the Illinois Consumer Fraud Deceptive Business Practices Act, Ill.Ann.Stat. ch. 815, § 505/2 *et seq.* DEKALB argues that only matters of contract interpretation are governed by Illinois law and that Callaway must rely upon the law of the state of Georgia for any tort claim.

■ A federal court sitting in diversity must apply the forum state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In contract actions, Georgia courts apply the traditional *lex loci contractus* rule: a contract is governed as to its nature, validity and interpretation by the law of the state where the contract was made, unless it appears from the contract itself that the contract was to be performed in another state. *General Telephone Co. of Southeast v. Trimm*, 252 Ga. 95, 311 S.E.2d 460 (1984).

"The traditional method of resolving choice-of-law issues is through a tripartite set of rules, which are lex loci contractus, lex loci delicti, and lex fori. Under the rule of lex loci contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply. [Cit.] Under the law of lex loci delicti, tort cases are governed by the substantive law of the state where the tort was committed. [Cit.] Under the rule of

lex fori, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought. [Cit.]"

*Lloyd v. Prudential Securities, Inc.*, 211 Ga. App. 247, 248, 438 S.E.2d 703 (1993) (quoting *Fed. Ins. Co. v. Nat. Distrib. Co.*, 203 Ga. App. 763, 765, 417 S.E.2d 671 (1992)).

 Although Georgia courts follow the rule of *lex loci contractus,* parties can stipulate that another jurisdiction's law will apply. *Velten v. Regis B. Lippert, Intercat, Inc.*, 985 F.2d 1515, 1519 (11th Cir.1993). The parties in this case agreed that the law of Illinois would govern the contracts. Consequently, any action for breach of a duty under one of the contracts will be governed by Illinois law.

The parties' agreement to displace the Georgia law of contracts does not, however, displace other applicable Georgia law. Under *lex loci delicti,* "[t]he place of the wrong is the jurisdiction where the harm was suffered or where the last event necessary to make an actor liable for the alleged tort takes place." *Velten,* 985 F.2d at 1521. Callaway alleges that it sustained damages in the state of Georgia, and the integration of the hogs into Callaway's herd occurred in Georgia. Under *lex loci delicti,* Georgia law will govern any tort claim brought by Callaway against DEKALB. Neither of the Illinois acts relied upon by Callaway is applicable.

**2. Fraud Under Georgia Common Law**

 To succeed on a claim of fraud in Georgia, a plaintiff must establish five elements: (1) a false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Copeland v. Home Savings of America F.A.*, 209 Ga.App. 173, 174, 433 S.E.2d 327 (1993). Callaway argues that the statement by Mr. Day was a false

representation upon which it relied in deciding to stay with DEKALB as its source of breeding stock. Because Callaway's alleged reliance was not justified, however, DEKALB is entitled to summary judgment on Callaway's fraud claim.

Any reliance by Callaway upon Day's statements was unjustified in light of the clearly written contracts. All of the written contracts provide, in bold, capitalized print, that "DEKALB cannot and does not guarantee the absence of any pathogens or disease in the breeding stock sold by DEKALB. Pathogens or diseases may be present at time of sale or may appear later." (Stip., Exhibit A, ¶ 10.) Moreover, Callaway expressly accepted responsibility for "[t]he presence of any pathogen or disease including, but not limited to, those pathogens or diseases listed in the Pathogen and Disease Statement above." (Stip., Exhibit A, ¶ 11.)

Callaway knew that the written contracts fully and completely reflected the agreement between the parties. All of the contracts contained a merger clause which read as follows:

*SOLE AND ENTIRE CONTRACT.* **THIS CONTRACT SUPERSEDES ALL PRIOR WRITTEN OR ORAL AGREEMENTS RELATED TO THE SWINE SOLD HEREUNDER AND THIS CONTRACT CANNOT BE AMENDED EXCEPT IN A WRITING WHICH REFERS TO THIS CONTRACT AND WHICH IS SIGNED BY BOTH PARTIES.**

(Stip., Exhibit A, ¶ 13.) Additionally, the Illinois Commercial Code provides that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded...." Ill.St.Ann. ch. 810 § 5/2–209. Illinois' parol evidence rule also prevents Day's oral statements from modifying the contract.[4]

---

4. Illinois' parol evidence rule provides that:
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous

oral agreement but may be explained or supplemented
 (a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and
 (b) by evidence of consistent additional terms *unless the court finds the writing to have been intended also as a complete and*

The fact that the allegedly false statement by Day occurred after the entry of the contracts does not support a different outcome. Delivery invoices, signed by an agent of Callaway, provided that the warranties and remedies, if any, applicable to the swine being delivered, were determined by the contracts. The invoices further instructed Callaway to refer "to that contract for the warranties, exclusive remedies, and statements regarding the swine, including their fertility, disease and soundness[,]" and stated that "[a]cceptance of the swine here delivered is a reconfirmation of that contract and its terms." (Stip., Exhibit G.)

In light of the unambiguous terms of the contracts, any reliance upon Day's statement by Callaway was unjustified. Chief Judge Sharp of the Northern District of Indiana reached a similar conclusion in a case addressing a fraud in the inducement claim brought by a plaintiff against DEKALB in his court. Quoting former Judge Ruth Bader Ginsburg, Judge Sharp stated that:

> Plaintiffs cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who has been induced by a fraudulent misrepresentation to enter the contract, must not be stretched or inflated in a way that would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties. We need not belabor the point. We have here the case of a party with the capacity and opportunity to read a written contract, who has executed it, not under any emergency, and whose signature was not obtained by trick or artifice; such a party, if the parol evidence rule is to retain vitality cannot later claim fraud in the inducement.

*exclusive statement of the terms of the agreement.*
Ill.Ann.St. ch. 810 § 5/2–202 (emphasis added). Given the merger clause in the contracts, there can be no doubt that the parties intended the contracts to be a full and complete memorial of their agreement.

*Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.,* 858 F.Supp. 831, 840 (N.D.Ind.1994) (quoting *One–O–One Enterprises, Inc. v. Caruso,* 848 F.2d 1283 (D.C.Cir.1988) (citations and internal quotation omitted)).

### 3. Good Faith

 I am cognizant of the general duty of good faith placed upon the parties to a contract by Illinois' Commercial Code.[5] I am also mindful that good faith, as it applies to DEKALB in these transactions, means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Ill.Ann.Stat. ch. 810, § 5/2–103. I do not find that knowingly shipping diseased hogs to a breeding farm is consistent with reasonable commercial standards of fair dealing in the trade. A close reading of the contracts between the parties, however, establishes, beyond any doubt, that Callaway acknowledged and assumed the risk that the swine it purchased from DEKALB might carry certain pathogens such as PRRS. Moreover, the contracts gave Callaway the right to have DEKALB test the animals, at Callaway's expense, for pathogens or diseases prior to delivery and cancel the contract based upon the results of that test. (Stip., Exhibit A, ¶ 11.) Callaway, however, did not exercise its right to have the swine tested by DEKALB for PRRS. Further, Callaway continued to take delivery of swine from DEKALB after its herd had been infected.

The clear language of the contract bristles with provisions dealing with the parties' rights in the event of disease. Paragraph 10 of the contracts, which occupies almost one quarter of the linear length of those documents, deals exclusively with pathogens and disease. It is unthinkable, given these provisions, that the parties' intent did not encompass the risk of disease. On the contrary, it is clear that Callaway and DEKALB recognized the risk of disease and allocated that

5. "Every contract or duty ... imposes an obligation of good faith in its performance or enforcement." Ill.Ann.Stat. ch. 810, § 5/1–203.

risk between themselves. Callaway is a sophisticated party, and, under the facts of this case, the Court will not endeavor to rearrange the commercial relationship between Callaway and DEKALB which is so clearly set out in the contracts. A seemingly harsh result cannot be the excuse for dismantling the law. The parties are governed by their contracts.

## III. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANT-** **ED.** The Clerk is ordered to **ENTER JUDGMENT for the Defendant and CLOSE THE CASE, TAXING COSTS AGAINST PLAINTIFF.**

**ORDER ENTERED.**