United States Court of Appeals,

Eleventh Circuit.

No. 95-8966.

RAYLE TECH, INC., d.b.a. Callaway Farms, Plaintiff-Appellant,

v.

DEKALB SWINE BREEDERS, INC., Defendant-Appellee.

Jan. 26, 1998.

Appeal from the United States District Court for the Southern District of Georgia. (No. CV194-072), Dudley H. Bowen, Judge.

Before TJOFLAT and BIRCH, Circuit Judges, and SMITH[*], Senior Circuit Judge.

SMITH, Senior Circuit Judge:

Rayle Tech, Inc., d/b/a Callaway Farms, brought suit against DEKALB Swine Breeders for fraud and bad faith in selling diseased swine. The district court granted summary judgment, dismissing Callaway Farms' claims. For the following reasons, we affirm.

*Facts*[1]

In 1992 and 1993, Rayle Tech, Inc., d/b/a Callaway Farms ("Callaway Farms") operated a large swine breeding herd with approximately 5000 sows in Wilkes County, Georgia. Callaway Farms regularly introduced new breeding stock into its herd supplied by DEKALB Swine Breeders, Inc. ("DEKALB"). DEKALB is in the business of raising and selling swine breeding stock.

From 1989 through 1994, Callaway Farms and DEKALB executed numerous written contracts documenting Callaway Farms' purchase of breeding stock from DEKALB. Each contract

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

[1]The facts are taken from the joint stipulation of facts prepared by the parties.

states that "[t]his contract shall be governed by the laws of the State of Illinois." Moreover, each contract contains a limitation of liability in the case of disease, stating:

> DEKALB CANNOT AND DOES NOT GUARANTEE THE ABSENCE OF ANY PATHOGENS OR DISEASE IN THE BREEDING STOCK SOLD BY DEKALB. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER.

The contracts recommend that the buyer have the swine tested at the buyer's expense prior to delivery. In the case of diseased swine, the contracts provide that replacement of the swine is the buyer's sole remedy. On the front page, in bold red letters, the contracts provide:

> DEKALB GIVES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SWINE OR THEIR PROGENY. DEKALB GIVES NO WARRANTIES OF MERCHANTABILITY, HEALTH OR FITNESS FOR A PARTICULAR PURPOSE.

Each contract contains a merger clause, stating that "[t]his contract supersedes all prior written or oral agreements related to the swine sold hereunder, and this contract cannot be amended except in a writing which refers to this contract and which is signed by both parties." Moreover, the contracts provide a blank for the purchaser to state any promises or representations made by the seller not otherwise specified in the contract. In five of the six contracts, Eugene Callaway, Jr., an officer of Callaway Farms, wrote "none" in the blank.

Porcine Reproductive and Respiratory Syndrome (PRRS) is a swine disease caused by a virus. In sows, PRRS may cause abortions and birth of stillborn, underweight, or defective pigs. PRRS is highly contagious and widespread.

During 1992 and 1993, DEKALB knew that its herds had either been infected with or exposed to PRRS. During this time, DEKALB received 829 positive blood tests for antibodies to the PRRS virus. A positive test for the antibody does not necessarily mean that the virus is present or that the pig will develop PRRS, but that the pig has been exposed to the virus at some time and is a potential carrier. In November of 1992, DEKALB observed clinical signs of PRRS in one of

its herds, and within fourteen months DEKALB found clinical signs of PRRS in eight of its twelve farms. Prior to March 11, 1993, two of DEKALB's customers complained that their herds had been infected with PRRS by animals purchased from DEKALB.

In late 1992 and early 1993, Callaway Farms considered replacing DEKALB with Pig Improvement Company ("PIC") as their supplier of breeding stock. Callaway Farms decided against this move, however, when it learned from a PIC veterinarian that PIC's herds had tested positive for PRRS. Callaway Farms explained to DEKALB's sales personnel that it wanted to avoid PRRS and that was the reason that they had decided to stay with DEKALB over PIC. Clinton Day, a DEKALB salesman, replied: "Well, that is a pretty good reason to stay with us."

Callaway Farms' herds tested negative for PRRS on March 1, 1993. On March 11, 1993, Callaway Farms received nineteen boars and gilts from DEKALB. The animals had no clinical signs of PRSS at the time of shipment or delivery. As was the conventional practice, a Callaway Farms farm manager signed the invoices upon delivery. Callaway Farms did not have any of these swine tested for the PRRS virus or antibodies prior to introducing them to the herd.

After the March 11 delivery of swine from DEKALB, Callaway Farms continued to accept new deliveries from DEKALB. On April 9, 1993, Callaway Farm's herds developed the PRRS virus. No swine were introduced to the Callaway Farms herds from any source other than DEKALB. At the time of delivery, six hogs received from DEKALB were isolated from Callaway Farms herds. After the outbreak of PRRS, these hogs tested positive for the virus.

*Procedure*

Callaway Farms filed suit in the United States District Court for the Southern District of Georgia alleging fraud and bad faith and seeking consequential damages in excess of $2,000,000. Callaway Farms amended the complaint to add a cause of action under the Illinois Diseased Animal

Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

DEKALB filed a motion for summary judgment. The district court granted DEKALB's motion for summary judgment on all counts, finding: (1) that Callaway Farms could not rely on the Illinois statutes for recovery, (2) that Callaway Farms had not stated a cause of action for common-law fraud under Georgia law; and (3) that no cause of action for "bad faith" exists under Illinois law. *See Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.,* 897 F.Supp. 1472, 1477 (S.D.Ga.1995).

### *Standard of Review*

This court exercises a complete and independent review of the district court's grant of summary judgment, and applies the same legal standards used by the district court. *See Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995); *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1117 (11th Cir.1993). As such, we must view all evidence and make all reasonable inferences in favor of the non-movant. *See Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1578 (11th Cir.1994). This court should affirm the district court's grant of summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

### *Application of Illinois Statutes*

Callaway Farms' amended complaint asserts causes of action under the Illinois Diseased Animal Act, 510 Ill. Comp. Stat. 50/24, and the Illinois Consumer Fraud and Deceptive Businesses Practice Act, 815 Ill. Comp. Stat. 505/2, 505/10. Callaway Farms contends that it is deserving of damages under these two statutes by virtue of the Illinois choice of law provision of the contract. We disagree.

We are bound by *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188

(1938), and its progeny to apply the choice of law provisions of Georgia to the facts of this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); *Velten v. Regis B. Lippert, Intercat, Inc.,* 985 F.2d 1515, 1519 (11th Cir.1993)(Because Georgia choice of law principles are matters of substantive law, Georgia's choice of law rules control.).

Georgia follows the approach to choice of law issues embodied in the First Restatement of Conflicts of Laws, employing the traditional rules of *lex loci contractus* and *lex loci delecti.*[2] *See Lloyd v. Prudential Securities, Inc.,* 211 Ga.App. 247, 248, 438 S.E.2d 703, 704 (1993). The rule of *lex loci contractus* mandates that "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." *Id.* Under the rule of *lex loci delecti,* "tort cases are governed by the substantive law of the state where the tort was committed." *Id.*

Although Georgia courts adhere to the rule of *lex loci contractus,* "parties by contract may stipulate that the laws of another jurisdiction will govern the transaction," *Manderson & Associates, Inc. v. Gore,* 193 Ga.App. 723, 389 S.E.2d 251, 254 (1989), unless the law is contrary to Georgia public policy, *see id.,* or the chosen jurisdiction has no substantial relationship to the parties or the transaction. *See Velten,* 985 F.2d at 1519.

The contracts between Callaway Farms and DEKALB contain a provision stating that the contracts "shall be governed by the laws of the State of Illinois." Application of Illinois law to the contracts at issue would not contravene Georgia public policy and Illinois has a substantial

---

[2]Along with Georgia, fifteen other states still adhere to the strict application of *lex loci delecti,* a choice of law provision that some commentators have branded "outdated territorialism." *See* Kay, Theory into Practice: Choice of Law in the Courts, 34 Mercer L.Rev. 521, 582-84 (1983); Eugene Scoles, Peter Hay, Conflict of Laws 17.7 (2d ed.1992).

relationship to the parties in this case. Therefore, the choice of law provision is valid under Georgia law. The Illinois choice of law provision does not, however, incorporate *all* Illinois law into the contract. No Georgia case has ever held that such a stipulation will bring in the entire body of law of the chosen state. Instead, in Georgia, a choice of law provision simply allows the contracting parties to choose the law of the state to govern their contractual rights and duties. *See, e.g., Velten,* 985 F.2d at 1519, 1520.

Callaway Farms asserts that *lex loci delecti* is inapplicable in this case because the law in question is statutory. Callaway Farms cites *Moyer v. Citicorp Homeowners, Inc.,* 799 F.2d 1445 (11th Cir.1986), for the proposition that Georgia choice of law rules honor choice of law provisions that apply statutory claims. Callaway Farms misstates the Georgia law. In *Moyer,* the statutes in question were usury statutes, and application of the statute was necessary to determine whether a contract term, the interest rate stipulated in the contract, was usurious. Therefore, Georgia law mandated that the statute be used in *Moyer* because it was needed to interpret a contract term. Georgia law mandates that the subject matter of the statute be analyzed to determine which choice of law rule applies and, therefore, the question whether the Illinois statutes are applicable turns on their characterization.

Subject matter classification of a cause of action is a natural and necessary starting point for analysis of a conflicts case. *See* Restatement 2d of Conflicts 7 cmt. b. Georgia law defines a tort as "the unlawful violation of a private legal right other than a mere breach of contract," Ga.Code Ann. 51-1-1; *see Mauldin v. Sheffer,* 113 Ga.App. 874, 150 S.E.2d 150, 154 (1966)(In cases alleging misfeasance or the negligent performance of the contract, a cause of action ex delicto may be had.). For an action stemming from a breach of a duty growing out of a contractual relation to be classified as tortious, the breach must be shown to have been a breach of duty imposed by law and not merely

the breach of a duty imposed by the contract itself. *Sutker v. Pennsylvania Ins. Co.,* 115 Ga.App. 648, 155 S.E.2d 694, 697 (1967). " "Duty imposed by law' means ... either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common-law principle declared in the reported decision of the appellate courts of the State or jurisdiction involved." *See Sutker,* 155 S.E.2d at 698; *Deacon v. Deacon,* 122 Ga.App. 513, 177 S.E.2d 719 (1970).

Because the Illinois Acts place duties on DEKALB independent of the contract, the action brought by Callaway Farms under these statutes is classified as one arising in tort. Therefore, the district court was correct in finding that the doctrine of *lex loci delicti* applies and that Callaway Farms cannot rely on the choice of law provision to recover under the Illinois statutes.

*Fraud*

The Georgia common law tort of fraud has five elements: (1) a false representation by the defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to the plaintiff. *See Copeland v. Home Savings of America,* 209 Ga.App. 173, 433 S.E.2d 327, 328 (1993); *Crawford v. Williams,* 258 Ga. 806, 375 S.E.2d 223, 224 (1989). In granting summary judgment, the district court found that Callaway Farms' reliance upon Mr. Day's statement was not justifiable in light of the contractual provisions disclaiming liability for diseases.

Callaway Farms asserts that the district court improperly granted summary judgment on the fraud claim, stressing that the question of justifiable reliance was one for the jury. In most cases, the question of justifiable reliance is a jury question, *Mosely v. Johnson,* 90 Ga.App. 165, 82 S.E.2d 163, 165 (1954), but where a representation is controverted by the express terms of a contract, a plaintiff will be unable, *as a matter of law,* to establish that his reliance is justifiable. *See Longnecker v. Ore Sorters (North America), Inc.,* 634 F.Supp. 1077, 1082 (N.D.Ga.1986).

DEKALB's contract with Callaway Farms devotes over fifty lines of text to disclaimers as to pathogens and disease and buyer's responsibilities as to testing and quarantine. The contract expressly states that "[o]rganisms which cause swine diseases (called pathogens) are present in every swine herd, including DEKALB's swine herds." In bold block letters, the contract warns that "DEKALB CANNOT AND DOES NOT GUARANTEE THE ABSENCE OF ANY PATHOGENS OR DISEASES IN THE BREEDING STOCK SOLD BY DEKALB. PATHOGENS OR DISEASES MAY BE PRESENT AT TIME OF SALE OR MAY APPEAR LATER." The contract could not be any clearer in disclaiming DEKALB's responsibility for diseases in its swine herds.

In red letters, in a paragraph labeled "BUYER'S UNDERSTANDING," the buyer must attest that he "ha[s] discussed the purchase of DEKALB Breeding stock with DEKALB, and ha[s] read this Contract, and, in particular, ... the "Pathogen and Disease—Statement and Limited Replacement Policy', and "Testing and Quarantine—Buyer's Responsibility' on the back of this page." The contract also has a space for the buyer to fill in any additional representations made by DEKALB representatives.

The situation is complicated somewhat by the fact that the alleged misrepresentation by Mr. Day was made after the contracts were signed. On delivery, one of Callaway Farms' farm managers signed a delivery invoice stating that:

> The Warranties and Remedies, if any, applicable to the swine delivered with this invoice are determined in the contract between you, the Buyer, and DEKALB Swine Breeders, Inc. Please refer to that contract for the warranties, exclusive remedies, and statements regarding the swine, including their fertility, disease and soundness. *Acceptance of the swine here delivered is a reconfirmation of that contract and its terms.* (emphasis added)

We agree with the district court that, by signing this invoice, Callaway Farms reaffirmed the

sales contract and all of its provisions, including the merger clause.[3] As such, Callaway Farms could not justifiably rely on the intervening representation of Mr. Day as a matter of law.[4]

*Contract Modification*

Callaway Farms further argues that Mr. Day's assurances modified the contract between the parties. We disagree. Under Illinois law, "[a] signed agreement which excludes modification or recission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." 810 Ill. Comp. Stat. 5/2-209(2).

Callaway Farms asserts that the clause excluding oral modifications was not separately signed by Eugene Callaway and, as such, the clause is ineffectual. The statute states, however, that between merchants, no separate signing is required. *See* 810 Ill. Comp. Stat. 5/2-209(2). A "merchant" is a "person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." As a large hog producer, Callaway Farms is a sophisticated purchaser and a "merchant" as contemplated

---

[3]Callaway Farms mistakenly relies upon *City Dodge, Inc. v. Gardner,* 232 Ga. 766, 208 S.E.2d 794, 797-98 (1974), for the proposition that under Georgia law, contract disclaimers of liability and merger clauses are insufficient to defeat a claim of fraud. *City Dodge* finds that a merger clause or a disclaimer provision cannot preclude a fraud claim *when the plaintiff seeks to rescind the contract.* This reasoning is only applicable when the contract is rescinded and, therefore, the disclaimer provisions have been vitiated along with the contract. *See Goober v. Gulf Oil,* 574 F.Supp. 237 (S.D.Ga.1983); *Hannah v. Shauck,* 131 Ga.App. 834, 207 S.E.2d 239 (1974). Callaway Farms has not attempted to rescind the contract and in fact characterizes its suit as one in tort which "involves affirmance of the contract." [Plaintiff's Brief, page 45] To avoid summary judgment, therefore, Callaway Farms must be able to show that there is a jury question as to justifiable reliance in light of the contractual disclaimers.

[4]Callaway Farms asserts that the capacity of the farm manager to contract for Callaway Farms is a jury question. The joint stipulation states, however, that the farm manager had signed many invoices before with Callaway Farms' knowledge and ratification. As a matter of law, the farm manager was an agent for Callaway Farms.

by the commercial code.

Because the contracts between DEKALB and Callaway Farms contain a clause which excludes oral modifications to the contract, and the contracts were "between merchants," Mr. Day's oral representation did not serve to modify the contract.

*The Covenant of Good Faith and Fair Dealing*

Although every contract implies good faith and fair dealing between the parties to it, "the covenant of good faith and fair dealing is not an independent source of duties assumed by parties to a contract and a breach of the covenant itself does not by itself create a cause of action." *Williams v. Jader Fuel Co., Inc.,* 944 F.2d 1388, 1394 (7th Cir.1991)(interpreting Illinois law). Moreover, no obligation can be implied upon the parties which would be inconsistent with the express terms of the contract. *Id.*

In the instant case, the parties agreed to language establishing the rights and duties of the parties with respect to diseased animals. The contract states that "Buyer expressly accepts all responsibility for ... [t]he presence of any pathogen or disease [in the swine purchased and] [t]he presence of any pathogen or disease in any swine other than swine purchased under the contract." Unless the contract was modified by Mr. Day's representations, therefore, we cannot find that DEKALB breached the covenant of good faith and fair dealing.

As discussed above, the contract was not modified by Mr. Day's representations, therefore DEKALB did not breach the covenant of good faith and fair dealing as the obligations of the parties were expressly included in the contract. *See Continental Bank, N.A. v. Everett,* 964 F.2d 701, 705 (7th Cir.1992).

*Common Law Duty to Warn*

Callaway Farms also raises the argument that DEKALB breached its common law duty to

warn Callaway Farms of the dangerous condition of the swine. As Callaway Farms did not raise this theory of recovery in the district court, we will not consider it on appeal. *See Federal Deposit Ins. Corp. v. Verex Assurance, Inc.,* 3 F.3d 391, 395 (11th Cir.1993)("appellate courts generally will not consider an issue or theory that was not raised in the district court."); *see also Villarreal v. Woodham,* 113 F.3d 202, 208 n. 4 (11th Cir.1997); *Caban-Wheeler v. Elsea,* 71 F.3d 837, 841 (11th Cir.1996).

## *Conclusion*

Because we agree with the district court that (1) Georgia law precludes application of the Illinois statutes, (2) that Callaway Farms cannot show justifiable reliance as a matter of law, and (3) that DEKALB did not breach the covenant of good faith and fair dealing, the district court's grant of summary judgment against Callaway Farms is

*AFFIRMED.*